Good morning to all. My name is Andrea Matheson, and I represent Mr. Neyra-Agramonte under the Criminal Justice Act. I will take half of the time because I have a co-counsel who is – I understand we're splitting the 20 minutes. Mr. Neda's conviction should be reversed because no rational trier of fact could have found Mr. Neda guilty beyond a reasonable doubt. I'm going to focus specifically on this. This is the one of the two issues from my brief, and I will at this time alert the Court, and I've already alerted counsel prior to the oral argument, that due to the fact in district court that trial counsel did not make an objection to the amendment – to the indictment, the plain error standard applies, and therefore, we are in the untenable position to argue under that – under that position and therefore, we're stuck with not being able to show the prejudice. So I will focus my argument only on the argument of the sufficiency of the evidence. So you're arguing only on Jackson, right? Yes, Your Honor. Okay. You're withdrawing your challenge to the amendment to the indictment. I'll submit on the brief. All right. Thank you. Thank you, Your Honor. Thank you. Now, there are essentially three points that the government brings up to sustain this level of evidence against Mr. Neda. Number one, that he was seen in the presence of Mr. Martinez, co-counsel, co-defendant, and Mr. Cervantes, who is a co-defendant in a severed case. Number two, that he was seen in the presence of Mr. Cervantes, who is a co-defendant in a severed case. Number three, that Mr. Neda agreed to drive a truck from Florida to Arizona, and that Mr. Neda showed a secret compartment in the truck. However, there was – Mr. Neda? Yes, he did. There's evidence then. He was only giving him directions from where he was at the truck stop to the warehouse. Well, why isn't that – why isn't that significant? Well, it has – okay. The warehouse is where the exchange was expected to take place. That's what the government would argue.  And that's why I'm not going to go into the specifics of the conspiracy and whether or not there was the knowledge of Mr. Neda that he had – that he actually had joined the conspiracy. And if you look at the facts that involve Mr. Neda, you're going to see that there's really, in this very extensive investigation with some money to the undercover officer, Agent Soto. At that point, they go to a warehouse. It is at supposedly that time that Mr. Martinez was going to be examining some product to see whether or not a deal would be consummated. So you're going to see in the briefings as well that there's really the twofold argument. Number one, that there wasn't a meeting of the minds by Mr. Martinez with his – with persons known or unknown to the grand jury with regard to the possession with intent to distribute the cocaine. And then there's the other argument, whether or not Mr. Neda became a knowing participant in the conspiracy. So there's necessarily those two. Are you going to address the evidence given by Soto of Neda taking him inside the truck and showing him the compartment under the bed where Neda told Soto he had used this compartment for the transportation of 70 kilos up to that point? I do mention that. I actually mentioned that in my beginning part, that where Mr. Neda showed the secret compartment in the truck at the warehouse. Yes. But previously there was – And says he used it to transport 70 kilos of cocaine. That's at the SCR volume 2, page 244. But you also see that in the clarification of the – it was Agent Santos Miranda who had explained that at that time they were talking about the successful transportation. Previously it was Mr. Martinez only who was there. And Mr. Martinez – Who said this, that the compartment was used to transport 70 kilos of cocaine? Who said that? Agent Soto said that. I'm sorry. In the presence of Agent Soto, he said that both – He being who, Neda? That Agent Soto specifically on cross-examination, he starts out that it was Mr. Martinez, and then on cross-examination he says, oh, it was Mr. Martinez and Mr. Neda. But then Agent Santos Miranda makes it very clear that it was only said by Mr. Martinez and it was with regard to 100 kilograms of cocaine. So – So there's a conflict in the evidence, right? Between those two there is a conflict. I know that we're – obviously the Court is in a situation that you have to view the evidence in light most favorable to the government. But I don't think that is a deal-breaker in terms of showing this secret compartment or admitting past criminal conduct. In this particular case, there's no proof that Mr. Cervantes, who was the defendant that was severed, or the money came in the truck with Mr. Neda. That was the theory of the government. That was the whole timeline, that Mr. Neda had gotten the vehicle at a particular time, and that necessarily it had to have been that Mr. Cervantes and the money accompanied Mr. Neda to Tucson. And there is absolutely no evidence about that. There's no proof of any connection or knowledge about this $90,000 that relates to Mr. Neda. You will see it's – the evidence is clear that $76,000 was from Mr. Cervantes, $14,000 was from Mr. Martinez. There was absolutely no connection that Mr. Neda even had knowledge with regard to this money or with regard to what this money was going to be used for. Well, what happened when the money became visible? The money became visible never in the presence of Mr. Neda until the – I know it was in the truck. I'm sorry? So what happened when the money became visible? Tell me what happened then. The money became visible in the Chrysler Pacifica. It was never visible in the truck. Well, but what happened when it was finally fronted? The money was fronted outside of the presence of Mr. Neda. I didn't know that, but what happened? They counted it. And what happened then? And then at that point Mr. Martinez makes a telephone call. And subsequently Mr. Neda comes in. Subsequently how much time? Not too long, maybe within 10 minutes, max. And you don't think that a rational jury could make some connections from all of this? The money comes out on the table. Martinez makes the phone call. Who shows up with the secret compartment in the truck? Mr. Neda. Well, it's one thing to talk about inferences and speculation. That's not speculation. That's what happened. Well, he came, but did he – there was nothing that showed that he acknowledged that a drug deal was going to be going down, that there was going to be an exchange of money, that the cocaine was going to be there. What we definitely see is that Mr. Neda drives up. He comes in. There's two and a half minutes. And in those two and a half minutes he shows a hidden compartment in the truck. That's the extent of it. But the jury's entitled to draw reasonable inferences. And the inference is, showed you some money, made a phone call. I had promised you – in fact, I think Martinez had said we need a warehouse for the truck. Truck shows up. Minutes later, Neda gets out and says, here's the compartment. Here's how you open it. It's under the bed and shows how it's been used before. I'm sorry. The reasonable inference that Neda was in on it seems inescapable. Well, the thing is, is that there's reasonable inferences. And then if we have to get to a point that mere association with people – You're just using labels. This is not mere association. Well, I beg to differ, Your Honor, because what we have in this case – Okay. So you're trying to penetrate a jury verdict. Do you realize what a high hurdle that is to get over? We take a look at this evidence in the light most favorable to what the jury did. But we have to look at the evidence that the government has presented. And if we look at things and we jump into some speculation. Let me give you one quick example about that. Counsel, you've got four seconds, because we don't want to take any time away from her. Yes, Your Honor. We're out of time.   Thank you. I'm Elizabeth Strange from the U.S. Attorney's Office in Tucson, representing the United States in this case. May it please the Court. I first would like to go through some additional facts that were not included that do show the involvement of the defendant in this case.  First of all, I would like to point out that the defendant's business was out of Miami. They used a tractor-trailer that had a secret compartment. They used this tractor-trailer to take money out of Miami and then to bring drugs back. On April 9th, Martinez talked to the agent and said, I'm going to meet you in Tucson on the 13th. The agent said, well, have you sent the money? And Martinez said the money, the code they used was girls, but it was the testimony was that they were talking about money. And Martinez said, the girls are leaving tomorrow. On the same day of this conversation, the defendant here flew from Las Vegas to Fort Lauderdale in the evidence, which is one-way ticket. And then the next day, the day that the girls were leaving or the money was leaving, he begins his log in his truck showing that he's leaving the Miami area. Now, he only drives, according to his log, which is signed by the defendant, shows that he only drove for an hour. And then he spent 18 hours, according to his log, in the sleeper berth where the secret compartment is. And after that, he began his trip in earnest. He arrived in time for the deal, which was to take going to happen on April 13th. What happened was Martinez got to Tucson late. He calls the agent, says, let's put off the deal until tomorrow. Fine. So the next morning, Martinez, Cervantes, they meet with the agent at Denny's, say, we don't have as much money as we had wanted. We're going to buy 5 kilograms. We only have 90 grand. The agent feigns being upset because he's playing the role of a drug dealer, but says, you know, let me check and we'll talk later. So from there, Cervantes, Martinez, drive to the truck stop. And that's where the defendant is in his truck, tractor-trailer, 18-wheelers there. Now, of particular note, he ---- Is it your position that Mr. Nera brought the $90,000 from Miami? That was argued, but it doesn't make any difference in terms of showing whether he did or not. It doesn't make any difference to his involvement.    And it doesn't make any difference to the defense that Nera ever saw the $90,000? Other than at the warehouse. He saw it where? In possession of whom? At that point, it was ---- had been counted using a counting machine and it was on a table where they had a money counter and then a ---- something to rewrap the cocaine, a wrapper. In the warehouse. And did you testify to that? Soto? Excuse me, Your Honor. Did Soto testify to that? About the money counting on the ---- Yes. And there was actually a videotape of what occurred in the warehouse. And in the videotape, you see the counting and you see the machine and you see the table set up. And you see Nera? You see Nera not when the money's been counted because he wasn't called until after the money had been counted. So he was not present during the counting of the money. Let me ask you again. Is there any evidence that Nera saw the money? Other than being in the warehouse where the money was, Your Honor, no. Before that time, there's no evidence. Excuse me, Your Honor, did you have a question? No. You answered my question. Thank you. What I wanted to point out was there is no ---- if you look at the trucker's log, he wasn't carrying any cargo. He listed no cargo, nothing, indicating he brought an empty trailer from Miami to Tucson. His destination, he shows to be Phoenix, not Tucson. But he arrived in Tucson in time for the deal. He's at the truck stop. There are pictures of him meeting with the other co-conspirators. Martinez then contacts the agent and says, I have the money. Let's meet. So they meet. That's when they meet at the Chevron. They meet at the gas station. And Agent Soto then is directed to get back, get in the backseat of Martinez's car. He does. He sees the $76,000 in some sort of dot kit. And Martinez says, I have the other $14,000 in my pocket. So Soto says, all right, follow me to the warehouse, because Martinez didn't know where the warehouse was. He follows them to the warehouse. They go to the warehouse. Martinez takes in Clorox wipes. He takes in latex gloves. They take the money in. They count the money. When they see that it's the amount that they had talked about, 90 grand, that's when Martinez calls the defendant and gives him directions how to get to the warehouse. And he shows up minutes later. And he comes in. Martinez says, meet the family, meet the family, was the testimony referring to the agents. And Agent Soto said, I'd like to see the compartment where the cocaine is going to be transported. And that was the testimony. To whom does he say that? He says it to Martinez and the defendant. NARA. Yes. And NARA says, come jump up in the cab and I'll show you. And he goes through a step-by-step demonstration. And this was very sophisticated. He turned on the ignition. He pulls on it. It doesn't open. He goes and he gets an extension cord. He plugs it in behind the TV. And it was powered by that. And then he pulled on it and it opened up. And he showed the compartment and it was sealed with silicone. Now, there's one thing. I disagree with counsel that there's a conflict about who said the 70 kilos. The testimony was this. Agent Soto, in direct, said, I was up in the cab. I was talking with NARA. Wait a minute, wait a minute. Agent Soto indirectly said? No, no, on direct. Oh, on direct. I'm sorry, Your Honor. On direct examination said, I was up in the cab. NARA said to me that this compartment had successfully carried 70 kilos of cocaine without detection. On cross-examination, he was asked, well, your report says that both Martinez and NARA said that. He said, yes, that's true. They both did. Well, that's not in conflict with his direct testimony, because he was only talking then about his conversation with NARA up in the cab. Now, Agent Miranda, when he testified, he said, I never talked to NARA. I only talked to Martinez. And Martinez said that there were 70 they transported 70 kilos of cocaine without detection. So there apparently were two conversations, but it's not – there's not a conflict there. And there was – so I disagree with that. But whether or not Martinez said it or NARA said it or they both said it, there's enough ample evidence here for any rational juror to have found the defendant guilty in this case. So after the step-by-step demonstration, that's when Agent Soto calls for the cocaine to be delivered. And they were expecting it by truck. And in came the truck with the cocaine. They waited for it. And that's when the – that's when they were arrested. So the defendant has asked you to focus on what's not important. You could say, oh, well, he didn't contribute any of the money. Well, that's – that wasn't his role. His role was to bring a specially designed tractor-trailer cross-country from Miami to Tucson. And his role was to take that cocaine back to Miami where they were going to convert it into crack and distribute it. So it's not important whether or not he contributed his money. It's not – it's not important whether he's the one who said 70K or not, although the testimony is they both said it. What is important is that the evidence, looking at it, as the Court knows, in the light most favorable to the prosecution, any rational juror would have found the defendant guilty. Thank you very much. Thank you. All right. Now we'll hear from the appellant, Martinez. Your Honor, if it please the Court, my name is David Alvarez, and I'm with the Federal Public Defender's Office in Tucson. Appearing with me is Jay Segar, who's also from the same office. We intend to submit on the issue – on the briefs on the other issues of the suppression, the consent, and the suppression of the statement. And at this time, I withdrew an argument as to Juror Instruction 5, I believe. So I want to focus on the part of Juror Instruction 4 that the district court did not give. Well, before you do that, I want to talk about the consent. Okay. What's the standard of review that we apply to that? The standard of review is once a district court judge makes a finding of fact, then it's clear error. And did you say – is that in your brief? No. No. Why not? Because that was my error on that part. Well, what's the best fact that you're relying on to argue that there was no consent? The testimony of the defendant at the suppression hearing, his testimony that he didn't understand English well enough to understand. He also said he thought there were – he testified there were guns present, that he was also handcuffed. And then the court made a finding that they didn't consent. And also that he was told that they'd get a search warrant if he didn't consent. That they would get a search warrant. And that the district court found that he – that the gun situation had been previously during the arrest, believed the agent that he was not handcuffed, that it took place then. Why do you identify a fact as one of the strong parts of your consent argument that the district court judge found did not happen, meaning they told him they'd get a search warrant if he didn't consent? Well, we believe that his findings were an error and that he gave more credit.  No, sir. How could it be an error when the district court judge listened to two different people testify, one says X, one says not X, and the judge picks X? I'm sorry, I'm not quite sure I understand the question. Do you realize that a credibility determination is literally bulletproof and can never be clear error? Have you read Anderson v. Bessemer? Yes, Your Honor. Well, what does Anderson v. Bessemer hold? Oh, no, I haven't read that case. Well, you just said you did. No, I understand that. You see, we get a lot of these kinds of cases. We don't ask you for the standard of review because we don't know it. We do know it. We ask you to specify that so that you'll understand what you're dealing with. And in the first place, you didn't give us the right standard of review because you didn't mention at all findings of fact, and now you try to tell us that that finding of fact was erroneous. If you had read Anderson v. Bessemer, it says, but when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. We're an appellate court. The trial judges, like Judge Pallmeyer, sit there and they make these factual determinations, and we're bound by them unless, as the Sixth Circuit says, they have the stench of a seven-day old unrefrigerated dead fish. You see, we get this kind of stuff all the time. Standard of review, I'm not trying to criticize you, I'm trying to help you, is meaningful. And when it says these things, we expect you to understand what they are and be able to deal with them, not just come up here and make another jury argument that we shouldn't have believed the agent we should have believed Martinez. Yes, Your Honor, I understand. See, so next time you get a standard of review issue, make sure you know what it is, that you put it in your brief and then you deal with it, instead of just saying, well, we don't think the judge was right when the judge made a determination that he was not told that they get a search warrant if he didn't consent. I understand. Okay. I want to focus on the part of jury, the defendant's jury instruction number four that was not given. The first part of the instruction was given, the second part of the instruction that was not given reads. What the first part has to do with the meeting of the minds. There was some reference by that, by Defendant Nero. The second part of the instruction reads, starting at line 6 on the proposed instruction. And the law requires more than a conspiracy to attempt to arrange a purchase of a controlled substance. If you find there is no agreement to purchase a controlled substance, but rather an agreement to negotiate such a purchase, then you must find the defendant not guilty. But isn't that simply cumulative? Counsel, if that's what it is. It is. It is cumulative because the second sentence, the government must prove there was a meeting of the minds to complete an illegal transaction, and the law requires more than a conspiracy to attempt to arrange a purchase of a controlled substance. What does the next sentence say that that sentence I just read doesn't say? The first part, the first part. It just tells them if you don't find an agreement, this is what you should do. Well, I think that. But that's not, that doesn't change the content of the instruction, does it? I think it does. I think that in Melchor Lopez, specifically, the law requires more than a conspiracy attempt. In Melchor Lopez, there were a series of meetings in which the defendant was negotiating the attempt to sell. He had, so that's different than when there was a meeting of the minds. I think it flushes out what the meeting of the minds meant. You have a meeting of the minds. So in Melchor Lopez, was there a meeting of the minds? There was an attempt to negotiate a sale. Are you trying to tell us in this case there was no meeting of the minds? There was an element missing in the meeting of the minds, and that is that they were still negotiating. In Melchor Lopez, there was a precondition. There were two preconditions. One was Melchor Lopez was not going to front. What do you mean they were still negotiating? In Melchor Lopez, they were still negotiating. But they weren't here. I think they were in this case. How is that? The defendant can't. They cut the deal. The money came out. Show me the compartment. They cut the deal. The unilateral contract, wasn't it? No, I think that there is, Justice Kennedy. In other words, it wasn't a promise for a promise. It was cash for Coke. Well, I think there were, it was a precondition. In Melchor Lopez, there were two preconditions which. Don't talk about Melchor. Talk about what is. In this case. In this case. What is the evidence? Here's my point, Mr. Alvarez. In order to get an instruction, a defendant has to tender, proffer sufficient evidence from which a reasonable person on the jury could accept his version. Now, where is the evidence that these two, when the $90,000 was counted on the table. Yes. And the cocaine was brought out. Where is the evidence that there was, they were still negotiating. Is there some evidence that they were trying to get a $74,000 deal? No. The negotiations would continue because if you look at the very beginning of the negotiations, the defendant needed 80 percent purity because he was going to convert to crack cocaine. So it was very important that he reach 80. During the in-person meeting on April 2nd, the defendant emphasized again to the agent, it had to be 80 percent or my people don't want it. That's the precondition. During agent Soto testified at trial, during the counting of the money, you can read that portion to you, but he says. It's a failure of consideration. It's not lack of negotiation. The agent said. That might be failure of consideration if you want to look at it. No, I don't think it is. If you look at Militia Lopez, it's a precondition. They didn't have a meeting in their minds. Here, the 80 percent was a requirement. Agent Soto testified on direct examination that while the first part of the money was counted, they were short. They were going to start counting the 14,000. Agent Soto said, and that's when the defendant asked to see the cocaine. And the agent testified he was concerned about the purity. If the cocaine did not reach 80 percent, there was no deal. So that was a condition present. But there was a meeting of the minds for $90,000 if the cocaine reached 80 percent purity. But that's a matter of performance, not a matter of contract formation. Well, if Militia Lopez is the law in terms of that instruction, that could be applied to that case. But it was, it was, there was no meeting of the minds. We also presented an expert witness who testified that. Did you argue that to the jury? Yes, sir, we did. But in this case, where I think I, I think there's a point here is that in jury instructions on the theory of defense, it's not whether you got the opportunity to argue. It's not how credible was the evidence or how significant was the evidence for the instruction. The evidence, as Escobar-DeBrite says, can be weak, can be inconsistent, it can be doubtful. And in Escobar, that case, it was the defendant herself who testified. So it could be self-serving. The point is there has to be some evidence the deal wasn't complete. If the 80 percent purity was a requirement, counting the money, and Militia Lopez, they even flashed money, it's not enough in this case for the instruction until he got his purity. And I think the jury has a right to be told that's what was a precondition. So if you find that they were only negotiating the potential purchase, wasn't finalized until we have 80 percent. What's important, the defendant said it has to be 80 percent or people don't want it. And during the county agent Soto testified, he asked to see the cocaine. No sale. Go ahead. That's all I have. Okay. Thank you. Oh, well, I do have one, but I'll say it for rebuttal. May it please the Court. I'll begin with the jury instructions, if I may. The problem with the half of jury instruction number 4 and the number 6 proposed instruction, which was the theory of defense, is that it was argumentative. It wasn't that it was argumentative and it tried to influence and present what was the defendant's construction of the evidence. And it was the basis upon which the trial judge refused to give the instructions. The trial judge for the half of number 4 that the trial judge did not include, he did not specifically give a reason on the record, Your Honor. No reason at all. And as to number 6, he said it's a comment on the evidence, which it wasn't. He felt that it was he felt that it was putting the court in the position of commenting on the evidence and putting the best spin on the evidence from the defendant's point of view. It was argumentative, but that wasn't the reason he gave. But maybe he thinks that commenting on the evidence means argumentative. I believe you could interpret what the court's comments were. Does it make any difference if he's right for the wrong reason? Does it make any difference? There is a problem with half of 4 and 6. And what this court, the reviewing court, does is look at all of the instructions together and to look to see whether or not the elements have been fairly and adequately presented. And they were in this case, Your Honor. And what the defendant has argued in his brief is, well, I didn't get the theory of defense, so I couldn't argue that there was no meeting of the minds, and I couldn't argue couldn't conspire with a government agent. Well, he got both of those. He got the cannot conspire instruction, and he also got the instruction that you have to have a meeting of the minds. And in addition to those, the elements were put forward in the jury instructions thoroughly and adequately by the judge. So looking at it as a whole, it was adequate. And the court didn't err for whatever reasons it gave or didn't err or didn't give. These instructions were properly rejected. I'd like to turn to just one other comment on that, Your Honor. The 28J letter that was submitted saying that the standard of review is de novo for theory of defense, the government agrees with that. We had that in our brief. But I think there's a typo here. It should say the Court stated it's reversible error to fail to give the instruction unless, and this is what's missing there, unless other instructions in their entirety adequately covered the defense theory. And that's what we have in this case. The other instructions did adequately present the theory, and the defendant argued it, was able to argue it, and did argue that in his closing argument. Turning briefly to the matter of consent, I — there was no clearly erroneous finding by the court who looked at all the totality of the circumstances, the Cormier factors, as well as the fact that there was a signed consent form both in Spanish and English, and so I don't think there's any question there about the ruling of the court. And even if it had been wrong, it would have been harmless error because the things taken from the hotel room were so insignificant compared to the other evidence. What was taken from the hotel room? What was taken was the hotel receipt for the room in Mr. Martinez's name. What appeared to be the contents of his wallet, it was cash, it was his Medicaid card, some other pieces of identification, and the bottle of rum. Was that — any of that introduced in evidence? All of it was introduced into evidence. I don't think it contributed anything to — Without objection? Correct, Your Honor. I — maybe I was wrong on this. I thought it was probably evidence that just established that Martinez was involved with Cervantes. Yes, I believe it showed that, but I think the more significant evidence was for Cervantes' connection was he went to the meeting at Denny's. Sure. And he — the testimony was that he had put up $76,000 of the $90,000. Which is why you're saying that anything they seized from the hotel room was probably insignificant vis-à-vis the finding of the jury. As to Martinez, yes. Yeah, absolutely. And I forgot there's one other thing. There was a — there was distinctive sunglasses that Cervantes wore and those were also seized in the room. Just very briefly, if I could touch on the waiver of Miranda. Just to be clear, the only thing that's being challenged in terms of statements is the nod up and down that was — the agent said that the Martinez gave in response to the agent's remark, well, we know that you had contacts in Miami who received the cocaine. In the interview, they made that comment after they had played one of the tapes of the conversations. And what they're not challenging is other statements that were introduced at trial, which is Martinez said he was in Tucson visiting family and that he was there with $14,000 in cash to buy a trailer. So the — just to go through it very quickly, knowing intelligent part of the question of Miranda came through the defendant's own testimony. He said that they gave him his Miranda warning in Spanish and English. When asked if he understood, he read the card himself. When asked if he understood his rights, he said yes. The voluntary part, the only basis on which the defendant says it wasn't voluntary is the timing. And he says he wasn't given his Miranda rights until after the questioning. That was specifically rejected by the district court as a finding of fact. The court found, in fact, it had been given the Miranda warnings before any of the statements given. So that was not clearly erroneous. Unless there are any other questions from the Court, I would. Thank you. Thank you. Thank you very much. We just asked that the Court. Mr. Cuevas, do you want a minute of rebuttal? Thank you, Judge. Just addressing the issue of — just to briefly summarize, if the Court finds that the law that was offered is correct in the instruction, that there was some evidence to support that instruction, then the review is de novo of the adequacy of all the instructions that were offered. In those instructions, could the jury have found the law that was offered in the defendant's theory of the case instruction? That's all the last point I wanted to make. Your answer is no. Our answer is no. And so they needed that attempt to conspire to arrange a purpose instruction in order to fully examine. And so this is not like any other instruction the Court is aware of. It's a theory of defense, and it's reviewed very differently than general instructions. Thank you, Judge. Thank you very much, Mr. Alvarez. Ms. Strange and Ms. Matheson, thank you for your argument. And the Court stands adjourned until tomorrow at 9 o'clock. Hearing three, all jurors who have not had a listen to the Honorable United States Court of Appeals but might hear it will now depart. For the support for this session, I'll stand adjourned. Thank you.
judges: Pallmeyer, Trott, Bea